## The Androscoggin and Kennebec Railroad Company *versus* The Androscoggin Railroad Company.

If railroads make a connection under a contract, its continuance, in certain cases, will be enforced in equity.

But, where such contract has been terminated by the parties, equity will not interfere.

The seventh section of the charter of the Androscoggin Railroad Company gives that company the right to connect its railroad with that of the Androscoggin and Kennebec Railroad Company, and the latter to connect its road with that of the former; but each company has the election whether it will thus connect or not; and the provision in question is a privilege and not a contract.

*It seems* that either company, having once elected to connect, might at its pleasure disconnect.

If not, the Legislature may authorize it to do so; and the other company cannot complain.

*It seems*, that if one company has elected to connect, that it does not impose on the other company the obligation of continuing the guage as existing at the time of the connection.

But, if so, the right does not become vested until the election to connect; and if, *before* such election, the other company is relieved by an Act of the Legislature, accepted by them, a subsequent election to connect is of no avail.

Chapter 475 of the laws of 1860, authorized the Androscoggin Railroad Company to change the guage of their road, and the Androscoggin and Kennebec Railroad Company, not having elected to connect their road with that of the former company until after that Act was passed and accepted, can now do it only in subordination to the rights conferred on the Androscoggin Railroad Company by it.

BILL IN EQUITY.

The hearing was on bill, answer and proof.

The main allegations in the bill were that the defendants by the seventh section of their charter were authorized, if they should elect so to do, to connect their railroad with the plaintiffs' railroad in Leeds, and the plaintiffs were required, in that event, to receive and transport all passengers and freight brought to them by the defendants, at certain rates of toll; and that the plaintiffs were authorized, if they should so elect, to connect their railroad with that of the de-

fendants, and in that event they were required to receive and transport all persons and property brought to them by the plaintiffs, &c.; that, if either party failed to transport persons, &c., thus brought to them by the other, the latter had the right to draw their cars over the road of the former with their own engines; that both roads were constructed with the same gauge, each elected to connect with the other, and had actually connected in 1852, and that the connection still continues; that the defendants were threatening to break up the connection, and change the gauge of their railroad, and thus deprive the plaintiffs of their rights; and prayed for an injunction.

A supplemental bill was filed, setting forth the granting of a temporary injunction, but that the defendants, disregarding the order of Court, had actually broken up the connection and changed the gauge of their railroad, and praying for relief.

The answer denied that any vote of either company was ever passed to connect their railroads, and denied, on belief, that any such connection ever was made; except that a physical connection was made between a side-track of the defendants' road with a side-track of the plaintiffs' road, and that these side-tracks were constructed by special agreement of the agents of the two companies, and not in mutual recognition of chartered rights; it alleged that a contract for the *connecting business* was made in 1852, and continued till May, 1855, and was abrogated by the plaintiffs; that under this contract their cars passed to and from the plaintiffs' road; it further alleged, on belief, that from May, 1855, to Feb. 1, 1857, there was no practical connection between the two roads, although the plaintiffs did receive and transport all the persons, &c., brought to them by the defendants, but at local rates; also, that on Jan. 30, 1857, another contract was made for the transportation of persons, &c., *as a joint business*, whereby their freight cars were drawn over plaintiffs' road, and this continued till Nov. 10, 1859, when the plaintiffs abrogated it in accordance with a

Androscoggin & Kennebec R. R. Co. *v.* Androscoggin R. R. Co.

provision contained in it, in consequence of a non-compliance by the defendants for a few days with some of its provisions ; and that, after that time, the plaintiffs denied to them all the rights of a connection between the roads, and carried their passengers, &c., only at local rates ; and so the defendants,

1. Deny that there is or ever was any connection between said roads, such as is intended by their charter or the laws of the State.

2. If the Court shall be of a different opinion, deny that such connection was made under the provisions of their charter or of the statutes of the State ; and aver that it was made under agreement and mutual arrangements, as before set forth.

3. If the Court should come to a contrary conclusion, deny that a connection rightfully made under their charter would bind them always to continue such connection ; or, if it would, that it would bind them to maintain their road upon any particular gauge ; or that either road was subordinate to the other.

4. Aver that, by the acts of plaintiffs herein set forth, they waived the right of connection, if any they had.

They admit that they changed the gauge, but allege that their intention to do so was notorious, and the plaintiffs must have known it, and yet suffered them to expend large sums of money before commencing these proceedings, which expenditure would be almost a total loss if the injunction prayed for should be ordered ; and they claimed authority under the Act of Feb. 15, 1860, authorizing the extension of their railroad, to do all they had done.

The testimony is voluminous, and only so much is given as bears upon the questions decided.

Abstract of plaintiffs' testimony.

*William Small.* — A connection was formed between the railroads of the two companies, in July or August, 1852, at a point near the station of plaintiffs at Leeds junction ; the road-way of defendants intersected or passed within the limits of plaintiffs' road, at a point about 300 feet north of

plaintiffs' depot ; and the track of defendants' road was laid parallel to the track of plaintiffs' road and upon their road-bed, from the point of connection between the road-ways, to the point of connection between the tracks, the defendant's track passing over a stone bridge, built by the plaintiffs, between the points named.  In order to effect a connection as convenient as might be, the station-house of plaintiffs was moved back from their track about sixteen feet, so as to admit a platform between the two tracks of plaintiffs' road for the accommodation of both parties ; the defendants furnished help in the removal of the building ; the frog, switch and fixtures, requisite to effect the connection, were furnished and put in position by plaintiffs, and extended one length of rail from the frog to meet the track of the defendants, from which point, to the place where the road-ways came together, the track was laid and kept in repair by defendants, although it was upon the plaintiffs' road-bed ; while the labor of forming the connection was going on, the directors of defendant company held frequent meetings at Leeds junction, and their engineer was frequently on the premises ; and they frequently had conversations.

After the defendants' road was opened for travel, the defendants made use of the plaintiffs' depot for their freight and passenger traffic, and could not reach it with their engines and cars without entering on the track of plaintiffs' road, and their engines and cars had daily access to it to connect with the train on plaintiffs' road ; passengers passed from one road to the other over the platform before spoken of ; the passenger cars of each company, whenever occasion required, were allowed to pass to and be used by the other company on their road ; the freight cars of the defendants, with their contents, were allowed to pass with the freight train of plaintiffs, to and from Portland and intermediate stations, when they were in a safe running condition.  The defendants were allowed to ticket passengers and to way-bill merchandise to Portland and intermediate points, whenever there was a contract existing between the parties, in

Androscoggin & Kennebec R. R. Co. *v.* Androscoggin R. R. Co.

relation to a division of the receipts for such service; when there was no such contract in force, each party was confined to its own road, as to ticketing passengers or way-billing merchandise.

From 1852 till 1860, in no instance were the engines or cars of the defendants prevented, obstructed or hindered by plaintiffs or their agents in passing from and to the station-house on plaintiffs' road, to make such connection of trains as was desired by them; and in no instance, within that period, did the plaintiffs or their officers or agents refuse or neglect, when requested, to receive the cars, passengers or merchandise brought over the defendants' road, or transport them upon their road, and *vice versa*, except when, in the opinion of the proper agent, the cars of the defendants were deemed unsafe, and, in such cases, the freight was transferred to the plaintiffs' cars.

There was much controversy between said parties, growing out of the business common to both roads. It related to the division of the receipts from passengers and merchandise; or what compensation should be paid or allowed to plaintiffs for their proportion of the joint business. But there was no controversy or question raised relative to the connection of the two roads, and no denial or refusal, by either party, to have the connection between said roads formed, under the provisions of their respective charters.

*Alonzo Garcelon.* — Was a director in defendant company from December, 1849, to December, 1857, and president of it in 1850, 1851, 1852, 1855, 1856 and 1857, and during that period had free access to and knowledge of all their proceedings. During my presidency, there was a connection formed between the railroads of plaintiffs and defendants, by the mutual consent of both parties; there was a meeting of persons on the part of each party to determine the mode and manner of forming such connection, about the last of July, 1852. John Reed, the engineer of defendants' road, was present with me on their behalf, and there might have been others also. Mr. Edwin Noyes, superintendent of

plaintiffs' road, was present on their part. The right of connection did not come into discussion, but only the manner of making it. The right of connection was never questioned to my knowledge while I was president. The connection was formed in the manner agreed upon at that meeting. The agreement was that we should run our track down by the side of their track and cross a small stream so as to run directly down by the side of their depot; that we were to lengthen the abutments of the bridge so as to enable us to lay our track upon the bridge, and to do the necessary filling to enable them to lay the track; and to lay the rails to the point where the other company were to, and did, put in a frog and switch and rail according to the usual custom of connecting roads. The plaintiffs were to give us the use of their depot and side-track; that agreement was carried into effect as soon as could be. The defendants continued to use that side-track and depot without interruption so long as the gauge remained the same. I never heard a denial on the part of plaintiffs to have that connection maintained; it was considered a very convenient arrangement and was satisfactory to the employees of the road; never heard complaint on either side.

There was constant quarrel between the roads, which grew out of the question of the division of the tolls received on business common to both roads; commenced soon after the connection was formed. A contract was made soon after, on 4th December, 1852, under which the business was done; the parties to it on part of defendants were Alonzo Garcelon and Allen Haines, and on part of plaintiffs Edwin Noyes and William M. Longley; that was the first written contract ever entered into between the parties; I have no knowledge of any intervening contract between that and one made in January, 1857; a good deal of negotiation before that. Before this last was made, and after the first, there was a submission of the matters in controversy to William R. Lee, and an award made by him, which was never carried into effect because defendants repudiated it.

Before the second contract was made, the defendants had applied to the Supreme Court for the appointment of commissioners for adjustment of matters in dispute. That application was pending when the second contract was made, and was afterwards dismissed when the contract was concluded, as part of the arrangement then made. In entering into these contracts, submission and application, I was directly authorized by the directors of the defendants; never permitted myself to do any act as president without express authority. At the time of making the contract of 1857, there was a balance of $16,000 or $18,000, claimed to be due to the plaintiffs, which the defendants were unable to pay. In compromise thereof, the defendants paid to plaintiffs, in 3d bonds of their company, at par, $8,000. On two or three occasions, while I was president, Mr. Noyes requested me to state upon what terms their company could run their cars over our road; no reply was ever given to his applications and no terms ever agreed upon.

The plaintiffs always claimed the right to run their cars over our road, under the charters.

Mr. Noyes never refused to do the business of the defendants' road, while I was president. After the balance, which plaintiffs claimed and defendants refused to pay, had accumulated to a large amount, I was notified, as president, that plaintiffs would refuse to take passengers and merchandise from our road, unless the fares and toll thereon collected by defendants, should be paid over directly to them. They refused to take either, unless paid for it, being unwilling that the debt should accumulate farther in defendants' hands.

*Edwin Noyes.* — Was treasurer of plaintiffs, from 1847 to July, 1849; and from thence to the present time, superintendent of their road, except from September, 1850, to August, 1851, and from August, 1853, to September, 1854.

Have had knowledge and full means of knowing all arrangements and agreements between the parties, both as to the connection of their roads and the traffic common to both, during the period above spoken of, and means of

knowing all arrangements made during the times when I was not superintendent; have participated in making all contracts between them, and such as are in writing I have drawn, and in all cases have been authorized by the directors to do what I did.

A connection of the two roads was formed in 1852, in Leeds, by the officers and agents of the two companies, and under the supervision of officers of both; the plaintiffs furnished and put in the frogs and switches and one rail, and the defendants laid their track along the road-bed of plaintiffs to connect therewith.

Prior to the formation of this connection, conversations had taken place between Dr. Garcelon, president of defendants, and myself, in regard to the most convenient place and mode of effecting the same, and the use of our road-bed for that purpose; and also as to the use of our depot and side-track; at his suggestion, a committee was appointed by plaintiffs, August 11, 1852, (vote annexed marked A.) Mr. Benson and myself were the committee. I met the persons representing the defendants, at Leeds, at the time agreed upon, Dr. Garcelon and some of their directors; we went over the ground and agreed upon the place and mode of connection, as it was afterwards executed as already stated. This was assented to by our directors, and also by the defendants' directors, as far as I knew from conversations with them. They performed their part of the service. It was taken for granted by our company, so far as I ever heard, that defendants had a right by their Act of incorporation as well as by plaintiffs' Act of incorporation, to connect their road with ours; the connection was always desired by this company, (plaintiff.) In all the conversations I had with defendants' officers prior to the connection and since, I never heard any question made about the right under the charter to make the connection.

*To 5th Int., viz.:* — "Was there any compensation made or paid by either party to the other, directly or indirectly,

to obtain the consent of such other to have said connection formed?"

*Ans.*—None whatever by either party to the other.

There has never been any denial, refusal or obstruction to such connection being made and continued, on part of plaintiffs or their officers or agents, nor have the defendants been by them in any way obstructed or impeded, in making the same.

Two contracts have been made between the parties respecting the mode of transacting business common to both roads, and the compensation to be received therefor; one, Dec. 4, 1852, about the time defendants' road was opened to Livermore Falls; the other, Jan. 30, 1857. A submission was also entered into, of the same matters, to Wm. R. Lee, and an award thereon made by him, Nov. 29, 1855. Under the contract of Dec., 1852, the business was conducted, and settlements made generally once a month, regularly, till August, 1853, when defendants requested some diminution of the price received by plaintiffs for transportation of defendants' freight; no modification of the contract was agreed upon. After which, defendants ceased to settle and pay over to plaintiffs sums belonging to them, received on the joint business, agreeably to the contract. Payments were from time to time made of such sums as defendants saw fit, but much less than the contract required. Lee's award was opened by the parties, soon after its date, but the defendants refused to abide by it or make any payments or settlements in accordance with it. Under the last contract, of Jan. 30, 1857, business was transacted and settlements made until Oct., 1859, when defendants ceased to pay as they had agreed, and, on 10th Nov., 1859, the contract was terminated for that reason by the plaintiffs, and notice thereof given to defendants. In 1858, the defendants had become very irregular in their payments, and so continued till the contract was terminated; and were frequently notified, that unless they settled and paid according to the contract, it would be declared void.

Plaintiffs have never refused to receive and transport in connection with their trains, defendants' cars and their contents, when the rates agreed upon or established were paid or offered, and their cars were in a condition to be run safely. States particularly the manner of doing the connecting business under first contract; defendants way-billed merchandise and sold tickets to passengers, over both roads, and received full compensation for both; their own cars, laden with merchandise, were transported over plaintiffs' road; passengers changed cars at Leeds junction; through fares were collected at each end of the entire route, at prices fixed by defendants, till March 24, 1856, at which time, no settlement having been made since August, 1853, and the defendants having in their hands a large amount, collected by them for through fares and freights, belonging to plaintiffs, the plaintiffs refused longer to allow the defendants to sell tickets and way-bill merchandise, and collect the fares and tolls therefor, over plaintiffs' road; and also refused to deliver to defendants, for transportation over their road, any merchandise, until the amount due to them thereon was paid. This was done to prevent the defendants from obtaining possession of any more money belonging to plaintiffs, and they were so informed and notified. No change was made in the mode of running passenger cars, or transferring passengers from the cars of one road to those of the other. When the merchandise cars came from defendants' road on to the plaintiffs', in order to way-bill and send them forward, and ascertain the rates of toll therefor, it became necessary that the contents of the cars and the weight of the different kinds of goods in them should be ascertained, and hence the cars, as a general thing, had to be unloaded, and afterwards reloaded into plaintiffs' cars, and way-billed at their established rates. Sometimes, when the contents of the cars were apparent, the cars were forwarded without unloading. The defendants at no time requested the goods to be reloaded and forwarded in defendants' cars, charged with rates established by plaintiffs. The tracks remained

connected as at first, and cars and engines passed from one to the other.

In Jan., 1857, when the second contract was made, about $18,000 was due to the plaintiffs, on the unsettled traffic prior to March, 1856, which plaintiffs discharged by receiving less than half the amount in defendants' bonds at par. Under that contract, the business of the roads was transacted, as before, under the former one; through tickets were sold, and merchandise way-billed, at through rates. After this contract was terminated, Nov. 1859, the business was done in the same manner as described, on and after March 29, 1856, up to the time when the gauge was changed and the defendants' cars ceased to run to plaintiffs' depot. Soon after the termination of the last contract, John B. Jones, president of defendants, notified me verbally that, on a given day, he should expect plaintiffs to receive and transport defendants' passenger car over plaintiffs' road, with its passengers, and would tender me the pay therefor; accordingly I went to Leeds junction on the train of that day, found Jones there, with a car containing passengers; there was a mechanic present in defendants' employ. The car appeared to be in an unsafe condition to run with a passenger train, at the usual speed, and I so informed Jones, and refused to take it, but took the passengers as usual. No offer or tender of the fare as established by plaintiffs was made by any person. Ensign Otis, one of the defendants' directors, was present and made some remark about offering to pay such a sum as he or they considered we were bound to take, but no offer of money was made by anybody. This was the only time I was ever requested to draw defendants' cars.

There has been no controversy whatever, between the time of opening their road and the time when the gauge was changed, upon any subject, other than the sum which plaintiffs should receive for the business common to both roads, or the share which each should have of the sums received for such business. Whenever contracts have been terminated, it has been because defendants would not or

could not pay to plaintiffs, money belonging to them, as they had agreed. In no instance have defendants or any of their officers or agents complained of a want of proper connection of the roads, or suggested any alteration or improvement, so far as I know or have heard.

In arranging the place and mode of connection originally, no compensation was required by plaintiffs for the use of their road-bed, bridge or culvert, over which defendants' road was laid, or of the side-track or station house. Some year or two afterwards, the defendants made some improvements in one of the rooms of the station house, for their own accommodation, at a trifling expense. Plaintiffs have always kept the switch and frog forming the connection in repair, and once renewed the frog. The station agent has always had charge of the switches about the station, and this among the rest; he has always been ordered, at suitable times, to admit the defendants' cars and engines to cross this switch and enter on plaintiffs' track in front of the depot, and arrangements have always been made to have the track ready to receive their trains when due. When the gauge was changed by defendants, the connection was broken at a point about 800 feet easterly of where the original connection was formed.

In no proposition of the defendants, or of any committee of defendants, did they offer to pay plaintiffs for doing their part of the business common to both roads, so much as they were entitled to according to the rates by them established.

In 1855, the defendants applied to the S. J. C. for the appointment of commissioners to fix the terms for which plaintiffs should do the business, under the statute of 1854. On the making of the contract of June 30, 1857, this petition, then pending, was entered "neither party" in Court.

In November, 1859, they applied by petition to the railroad commissioners, and were heard by them; an award was made and delivered to J. B. Jones, their president, but was never returned to Court.

They applied again in April or May, 1860. I have been

present at all the hearings by the commissioners on each of said petitions, and in no case has it been claimed or pretended, by the defendants or their officers or agents, that said roads had not been connected; but, on the contrary, both parties have conceded that such connection existed, and the defendants have claimed that under 7th section of their charter they had rights as a connecting road; they differed as to the rates of compensation thereby provided. Both the arbitrator and the commissioners awarded to plaintiffs more than was fixed by the contract of 1857. In Nov., 1859, when that contract was terminated, there was due to plaintiffs on traffic for September previous, $530,81, and of October, $1,610,01, which has not been paid.

"A.

"At a meeting of the board of directors of the Androscoggin & Kennebec Railroad Company, August 11, 1852,—

"*Voted*, That the president and superintendent be a committee to make such arrangement and contracts for the connection of the Androscoggin Railroad with the Androscoggin & Kennebec Railroad, for the use of any of our side-tracks and lands at Leeds, as they shall deem proper. And that the president be authorized to make and execute any conveyances necessary to carry out the same."

Various documents were put in by plaintiffs, but they do not become material.

The testimony of the defendants tended to show that there was "a junction or geographical connection of the two roads" under an agreement between the agents of the two companies; but that there never was any vote of defendants electing to connect their road with that of plaintiffs.

There was also testimony as to the contracts for the "connecting business" of the two roads, not materially different from that of plaintiffs.

The defendants put in the following vote of plaintiffs' directors, Nov. 27, 1860:—

"*Voted*, That this company do elect to connect their railroad with the railroad of the Androscoggin Railroad Com-

pany, at the point of junction of the two railroads, in the town of Leeds, in accordance with the provisions for that purpose, contained in the seventh section of the Act incorporating the said Androscoggin Railroad Company, approved August 10th, 1848, and that they so connect.

"*Voted*, That the president be instructed to furnish the president of the Androscoggin Railroad Company with a certified copy of the foregoing vote, and that the clerk be directed to furnish the clerk of that corporation with a certified copy of the same."

*Evans*, for plaintiffs.

The railroads were connected as early as 1852. The defendants deny that this was done under the charter, or that either party ever "elected" to connect, — meaning thereby that "no vote of stockholders or directors was ever passed to that effect."

These denials are "upon information and belief," are of very little weight, and do not require evidence equivalent to the testimony of two witnesses to overcome. 2 Dan. Ch. Pr., 984, note 1, and cases cited; *Copeland* v. *Crane*, 9 Pick., 78.

I. The evidence in the case abundantly shows that both parties *did* elect to form the connection authorized by their charters. No better evidence can be had of such election, than the *fact* admitted in the answer, and proved by all the witnesses, that an *actual connection* was formed, by the mutual *assent* of both parties, and by their joint labor.

This "election" may be proved in other modes than by the records of the corporations.

The ancient rule, that corporations can bind themselves only by deed, and by votes duly recorded, &c., is entirely exploded. *Contracts*, even, may now be implied from the acts of corporations or their authorized agents. 2 Kent's Com., 233; *Cram* v. *Bangor House*, 12 Maine, 357; Angel & Ames on Cor., §§ 228, 229 and seq.; 3 Met., 137; *Bank* v. *Dandridge*, 12 Wheat., 68; *Bank of Col.* v. *Patterson*, 7 Cranch, 305–306.

II. But the "election" does appear of record. As to the defendants :— As early as 25th August, 1849, their directors had determined not only to effect a junction with the plaintiffs, but had also designated the place where it should be ; (See extract from records,) a location *from the junction* ordered, and a committee appointed, and an *agent to negotiate with the plaintiffs.*

On 9th October, 1849, the located line "*from the junction*," &c., accepted.

September 7, 1850, ordered to lay the track from the junction, &c.

So, on the part of plaintiffs :— On 11th August, 1852, their directors passed a vote appointing a committee to make such an arrangement for the connection of the roads as they should deem proper.

And, under this authority, the *place, mode* and *manner* of forming the connection was fixed and agreed upon.

III. The acts and conduct of the parties, for a series of years afterwards, show most conclusively the election to make the connection on both sides ; and that each thereafter constantly claimed rights under it, by virtue of the Acts of incorporation.

The defendants made application, April, 1865, to the Supreme Judicial Court, to have commissioners appointed to fix rates of toll. The petition set forth that the roads *had been connected, &c.,* but that they failed to agree "upon terms of connection and *the rates*" for transportation.

The answer to this application set forth the terms of the Acts of incorporation, and averred that the then petitioners, now defendants, "had elected so to connect their road ; and the then respondents, now plaintiffs, have assented to and acquiesced in such connection ; and averred that this connection, so made, with its legal incidents, was still in force, and binding on both parties, till it should be changed or abrogated by mutual consent."

The petition of defendants of Nov. 19, 1859, to the railroad commissioners sets forth, in so many words, "that, by

virtue of its charter, and the charter of the Androscoggin and Kennebec Railroad Company, it has long since become a connecting road."

V. Assuming, then, that the roads were connected, by the election of both parties, in conformity with their charters, and by mutual agreement as to the place, mode and manner, what rights thereby accrued to the parties respectively?

We maintain that each thereby acquired the right to have the connection, so formed, kept up and maintained indefinitely, as it then existed; that neither could be deprived of this right, or debarred of its enjoyment, but by its own consent, or the law of the land; that it was a perfect, absolute and vested right—a franchise, a property, protected by law, and beyond even the reach of legislative control. It rests in grant from the sovereign power; it is given by statute; consummated and carried into execution by the mutual assent and agreement of both parties, and which neither can rightfully abrogate or impair.

These are familiar principles, and are sustained by numerous and familiar authorities.

It can hardly be necessary to refer even remotely to *Fletcher* v. *Peck*, and the Dartmouth College case, or any of the long list of decisions in the National and State Courts, where these principles are maintained.

They are familiar to the Court, and will be found recognized and approved in a late case in Maine. *State* v. *Noyes*, 47 Maine, 189.

The case of *Oxford Central R. R.* v. *At. & St. L. R. R.*, 46 Maine, 69, is to the same purport.

*Boston & Lowell R. R.* v. *Salem & Lowell R. R.*, 2 Gray, 1, bears a close resemblance to this in many respects, and stands upon precisely the same principles. In the arguments of counsel on both sides, and the opinion of the Court, the law of the case is most fully exhausted.

It is a decisive authority, also, for the jurisdiction of the Court, and the appropriateness of the remedy.

VI. The right of connection, secured by the charters and exercised by the parties, is permanent in its nature, and obligatory, until by mutual consent or process of law it be abrogated.

"A contract between two railways, that each shall run upon the track of a portion of the other's line, is of a permanent character, and cannot be determined without the consent of both parties." Redfield on Railways, § 213, cl. 6; *Great Northern, &c.* v. *Manchester, &c.,* 10 English Law and Eq., 11.

VII. The acts of the defendants, in breaking up the connection and changing the gauge, were a violation of the plaintiffs' right, — a private nuisance, for which the only adequate remedy is that sought in this bill. See 2 Gray, *ub. sup.*

Even if the connection had been formed, as averred in the answer, by an agreement between the parties, independent of the statute, yet, being formed and consummated on good consideration, neither party could abrogate it; *a fortiori,* when founded on statute. *Columbus & Piqua Railroad* v. *Indianapolis & Bell. Railroad,* 5 McLean's C. C. R., 450, which is an authority for the mode of remedy, also; Redfield, § 215, cl. 1, 2, 3, 4.

VIII. The Acts of Feb. 15 and March 20, 1860, authorizing the extension of defendants' road, did not, either directly or by necessary implication, authorize them to change their gauge or break up the connection then existing. On the contrary, by § 2, p. 56, they were made subject to all the duties and liabilities in regard to the extended part, which they were under respecting the then existing part, — that is, among others, the liability to a connection with the plaintiffs' road.

But, if the Legislature did intend to authorize defendants to break the connection, it furnishes no justification; — such a provision, invalidating the rights of plaintiffs given by charter, being clearly unconstitutional.

IX. The plaintiffs have not lost any of their rights by acquiescence or delay in enforcing them.

*Gilbert*, for defendants.

The opinion of the Court was drawn by

APPLETON, C. J.—Railroads may make a connection by virtue of a contract mutually entered into between them, or under the provisions of a statute authorizing such connection.

(1.) If the connection be under and by force of contract, its continuance in certain cases will be enforced in equity. *Columbus, Piqua, &c. Railroad Co.* v. *Indianapolis Railroad Co.*, 5 McLean, 450 ; *The Great Northern Railroad Co.* v. *Manchester, &c. Railroad Co.*, 10 English Law and Eq., 11.

There have been two contracts between these parties, both terminated by the complainants for reasons deemed by them satisfactory. Having claimed and exercised the right of terminating these agreements, they cannot have the aid of a court of equity to enforce the performance of contracts. already terminated.

(2.) The respective rights and obligations arising from a connection, made in pursuance of statutory provisions, can only be ascertained by recurring to the statutes conferring rights and imposing obligations.

By the charter of the Androscoggin & Kennebec Railroad, granted March 28, 1845, c. 270, § 7, the Legislature reserved the power to authorize other railroads, "coming from a northerly or easterly direction," to connect with that railroad.

By the charter of the Androscoggin Railroad, granted in 1848, c. 184, § 7, that road was "authorized and empowered to connect, *if it shall elect so to do*, with the Androscoggin & Kennebec Railroad, at any point in either of the towns mentioned in the first section of this Act, which the directors of said corporation may select ; and said Androscoggin & Kennebec Railroad *shall receive and transport* all persons, goods

and property of all descriptions, which may be carried and transported to its railroad on said Androscoggin Railroad, at the same rates of freight and toll on such passengers and other property as may be prescribed by said Androscoggin & Kennebec Railroad Company, so that the rates of freight and toll on such passsengers and other property as may be received from said Androscoggin Railroad shall not exceed the general rates of freight and toll on its road received for freight and passengers at any of the deposits of said corporation; *provided, also,* that the Androscoggin and Kennebec Railroad Company, *if they shall elect so to do,* are hereby authorized to connect with the said Androscoggin Railroad, subject to the provisions of an Act relating to railroads, approved March seventh, one thousand eight hundred and forty-two."

By this section either railroad could elect to connect or both could so elect. If either elects to connect and does so connect, it thereby acquires the rights of a connecting railroad and not otherwise.

No definite gauge is established in the charter of either railroad company, and each has the right to make "such rules, regulations and provisions, as the directors shall from time to time prescribe and direct." Each corporation had by its charter the right to fix its own gauge or to alter it, as should be deemed most conducive to its own interests.

The Androscoggin Railroad is "authorized to connect, if it shall so elect, with the Androscoggin & Kennebec Railroad," &c. This is not the language of a contract. It is a privilege conferred. When one corporation elects to become a connecting road and the connection is made, it acquires the right to have the railroad, with which the connection is made, "receive and transport persons, goods and property of all descriptions, which may be carried and transported" thereto. The exercise of this right is a matter of election. The continuance of such exercise is equally a matter of election. There is nothing compulsory on the

railroad thus electing. It is thereby deprived of none of its rights. The electing and connecting railroad enters into no contract. It merely elects to make use of a privilege conferred — to enjoy certain rights. It may abstain from enforcing its rights or claiming its privilege. So any individual may omit or neglect to bring his goods or property to the railroad for transportation.

The duty or obligation thus imposed upon the railroad with which the connection is made, does not restrict it in the general management and control of its road. The obligation to receive and transport is subordinate to the general powers of the corporation to manage and control its property and determine its gauge. It authorized the connecting railroad to require the reception and transportation of all persons and property it might transport *to* the rail with which it is connected. It imposed upon the latter only the obligation to receive and to transport. It did not require the former to bring persons or goods to be transported. It left the general rights of the corporation unaffected and unmodified, except as changed in this single respect.

"When, in the charter of a railway company, a right is reserved to the Legislature to allow other railways to connect with the former, upon such terms as shall be reasonable, complying with the established regulations of such company upon the subject, and, in pursuance of such reservation, a junction is made by a second railway company with the first, which, in faith of such connection, proceeds to make expensive and permanent repairs for the accommodation of the enlarged business thus brought upon its track, it was held that this imposed no obligation upon the second company to continue the connection permanently. And, also, that the second company might lawfully obtain an extension of their own road, so as to do their own business, without continuing the connection." Redfield on Railways, 436 ; *Boston & Lowell Railway* v. *Boston & Maine Railway*, 5 Cush., 375.

But, if it were assumed that a connecting road could not, at its own election, withdraw a connection once made, the Legislature, which authorized and empowered it to connect, might, it would seem, authorize and empower it to disconnect. This has been done by the Acts of 1860, c. 386, by which the extension of the Androscoggin Railroad was authorized, and by c. 475, by which it is empowered "*to connect with the Kennebec and Portland Railroad.*" To allow a disconnection was, as to the defendants, merely allowing them to surrender a right. To this the Androscoggin Railroad Company cannot object, for they have accepted the provisions of the Act. The complainants thereby have been relieved from a burden imposed. There is no violated agreement of which they can complain.

The complainants allege that they have a vested right to the continuance of a connection once made; that this connection, once established, imposes on the connected road the perpetual obligation of ever continuing the gauge as existing at the time of the connection, and is an interdiction to any future change. If this be so, the obligation and the interdiction are matters of inference merely, and it is difficult to find the language in the charter of either corporation from which such inferences can be legitimately drawn.

But, suppose it to be so, the rights given by statute do not become vested till the election to connect is made. As, by § 7, one of the corporations may elect to connect and not the other, it is manifest there may be an actual connection, in the making of which each may have an agency, while there is but one connecting road — that is, one road which has elected to be such. In the making of the connection, consultations may be had as to the place where and agreements be made as to the mode in which the connection shall be had, without the railroad with which the connection is made thereby becoming a connecting road. Neither road can become such by § 7 without its own election thus to be.

The offer to the complainants, by § 7, to be a connecting road can afford no rights until its acceptance. The statute

authorizing the election may be repealed. If repealed, before the acceptance of the rights thus conferred, a subsequent acceptance would be of no avail. A repeal may be in express terms or by necessary implication.

The special Act of 1860, c. 475, expressly authorizes the Androscoggin Railroad to connect with a railroad of a narrower gauge. Neither the statute granting the charter of the complainants nor that of the respondents established a gauge for either. The statute c. 475, by necessary implication, authorized a change of gauge. It authorized a connection which could not be made with the gauge then in use. The respondents have accepted the change in their charter, and acted under it by making the connection thus sanctioned. They are entitled to the protection of the law, when in the exercise of their chartered rights.

The special Act of 1860, c. 475, authorizing the connection of the Androscoggin Railroad with the Portland & Kennebec Railroad, was passed and went into effect on 20th of March of that year. This empowered a change of gauge, for it permitted and allowed a connection to be made with a railroad of a different gauge. It was accepted by the defendant corporation — which thus became entitled to all the rights and privileges thus conferred.

The complainants, at a meeting of their corporation, held on 27th of Nov., 1860, voted to "*elect* to connect their railroad with the railroad of the Androscoggin Railroad Company, at the point of junction of the two railroads in the town of Leeds, in accordance with the provisions for that purpose contained in the seventh section of the Act incorporating the said Androscoggin Railroad Company, approved August 10th, 1848; and that they so connect." The president was further directed to furnish the president of the Androscoggin Railroad Company with a certified copy of the foregoing vote.

When the complainants thus, by their vote, elected to become a connecting road, it was *after* the defendant corporation had been authorized to form a new connection with a

different gauge,—had accepted this modification of their original charter and had acquired new rights under it. The complainants did not seasonably make their election. They had no vested right arising from any election made when the defendants were empowered to make the change which they have made.

The complainants do not ask for a connection with the road as it now is, with its altered gauge.

The prayer of their bill is, that the respondents may be enjoined to change their existing gauge to that of the complainants. But when the complainants made their election to connect, it was made with a full knowledge of the rights conferred on the respondents by the Acts of 1860, c. 386 and c. 475, and of their probable action under those Acts. The complainants could not, at that late day, so elect to connect as to deprive the respondents of the new privileges thus conferred. If, then, they may claim to connect, it is only in subordination to the rights of the repondents, existing when their election was made.

The privilege of a connection was proffered the complainants. It was not accepted until it was too late. It never vested, or if it did vest, it was a right to *connect* subject to the changes the defendants were empowered to make in the gauge. But this is not the connection prayed for in their bill. The complainants have shown no vested right in any particular gauge, and have no ground of complaint.

The present bill was filed Sept. 20, 1861, long after the respondents had expended large sums of money in building the extension, and in purchasing cars, &c., for their altered gauge. It does not appear. that the complainants had ever run their cars over the respondents' track, or had contemplated so doing. . The expenditures, thus made upon the extension, were made with a clear understanding on the part of those controlling the complainants' corporation of the purposes and objects, for which they were so made. The complainants delayed filing their bill until after this great outlay had been made. After so great a delay in enforcing their

alleged rights they can neither equitably nor legally interfere. *Bill dismissed with costs for respondents.*

CUTTING, WALTON, DICKERSON and BARROWS, JJ., concurred.

DAVIS, J., dissented.

DAVIS, J. — The Androscoggin and Kennebec Railroad Company was incorporated March 28, 1845. In their charter, the Legislature reserved the right to "authorize other companies to connect their railroads with the railroad" of that company.

August 10, 1848, this reserved power was exercised by the Legislature, by granting such right of connection to the Androscoggin Railroad Company.

Generally, such a right is conferred upon *one* company, as a *privilege,* and imposed upon the *other,* as a *burden,* or servitude. The former may exercise it or not, at its election; and, if the connection has been formed, it may withdraw and discontinue it, whether the other company consents or not. *Boston and Lowell Railroad* v. *A. and W. Railroad Co.,* 5 Cush., 375. But the latter company has no such right to disconnect; for that would be abrogating a right reserved, and expressly conferred by the Legislature upon the other company. Such have been the rights and liabilities of connection under all the charters granted in this State, except in the case at bar.

In this case, when the right of connection was conferred upon the Androscoggin Railroad Company, it was provided that the Androscoggin & Kennebec Railroad Company should also have the right to connect their railroad with that of the former company. Such right, however, was not the less absolute in each, because conferred upon both. The former company, it is true, was under no obligation to *construct* its road. But, having constructed it, the right of the other company, like its own, became fixed and perfect. And this right was thereupon as absolute in *each,* as it would have been in either one, if conferred upon one only.

And even if this right, in either company, would have been lost, without an *election*, within any period of time, to exercise it, it was not so lost in this case. For it is not questioned that, immediately after the latter railroad was finished, the two railroads were actually connected, by the joint action, and at the mutual expense, of the two companies. They thereby *both* "elected" to avail themselves of the right conferred by the Legislature.

Since that time there have been many difficulties and controversies between the companies. Business connections have been formed, and afterwards terminated. Under additional authority, granted by the Legislature, Feb. 15, 1860, the Androscoggin Railroad Company extended its railroad from Leeds to Brunswick; and having constructed the extension upon a different gauge from that of the portion previously made, the gauge of that was then changed to correspond with it. This practically disconnected the railroad from that of the Androscoggin & Kennebec Railroad Company, by making them of a different gauge. It is for this that the present suit in equity is brought, praying that the former company may be enjoined to restore the rails upon their road to the same gauge as before, so as to make the connection available as it previously existed.

It is contended in defence, that the charter confers no right except to a *business* connection; and that, if it is held otherwise, the right is not *perpetual*.

A *business* connection can be predicated of the *companies* only; the *railroads* may be connected *physically*. Either may exist without the other. The former is necessarily a matter of *contract;* the latter can be obtained only by contract or by legislative grant. For every company, except as limited by its charter, or by general statute, has the exclusive control of its own track.

*Business* connections are common in this country, not only between companies owning intersecting or adjacent railroads, but between companies that own roads widely separated. Freight and passengers are transported long dis-

tances upon one ticket, or by one contract, made by one company for itself and others. No legislative grant is necessary for this purpose. The details of any such arrangement are necessarily so diversified and fluctuating, that it cannot be supposed that the Legislature would ever attempt to grant any such right.

And the express terms in which the right of connection has been reserved or granted excludes the idea that it is a right to a *business* connection. It is a connection of the *railroads* and not of the *companies*. In nearly all the numerous charters granted between 1835 and 1842, the Legislature reserved the right to "authorize any other company to *connect any other railroad* with the *railroad* of said corporation, *at any points of intersection* on the route." In 1842, the general statute required every railroad corporation to draw over its railroad the cars of any other company, "which has been or may be authorized by the Legislature to connect *their railroad* with the *railroad* of such corporation." And, in case of refusal, the company having the right of connection was authorized to "draw its own cars over the other road, with its own locomotive."

This language clearly relates to a connection of the *rails*, and not to any *business* arrangements. And, in subsequent charters, the language is still more clear and definite, giving the right of connecting other railroads "coming from a northerly or easterly direction," as in the case before us; or "on the easterly side thereof," as in the charter of the Atlantic and St. Lawrence Railroad Company. By the right of connection, therefore, is meant a *physical* connection, by which trains can pass from one railroad to the other. Such a connection was actually made between the two railroads in controversy, by the joint action of the companies, in 1852; and that connection continued, without interruption, until September, 1861, when it was interrupted by the change of gauge complained of in this suit.

Is the right of connection, when thus reserved and granted by the Legislature, *perpetual?* Or may the company

*subject* to such connection in any way interrupt or terminate it?

That a railroad company may be bound by its *contract*, therefore, to maintain a connection perpetually, there can be no doubt. But, in such cases, the *perpetuity* of the connection must appear by the contract to have been intended by the parties. They are not held to be perpetual from the nature of the connection; nor from the interests involved in it; but because the parties have *agreed* that they shall be perpetual. And this applies as well to cases in which two companies agree to connect their *railroads*, so as to run trains from one to the other, as to cases in which such companies agree to a *business* connection, either with or without any connection of their *roads*, by a junction of the rails.

A right, which a company has, to connect its *railroad* with that of another company, originating, not in any contract, but reserved and granted by the Legislature, if the roads are, and continued to be, of the same gauge, is in its nature perpetual. It is like a reservation in a deed, or the grant of an easement. Like any other right under the charter, it cannot be abrogated or lost, except by a forfeiture of the charter itself. A reservation made in a grant, or a condition annexed to it, is an inseparable incident of the thing granted; and this familiar principle is as applicable to grants of corporate rights, powers, and franchises by the Legislature, as it is to other grants.

What, then, is the extent of the right so reserved and granted? What construction is to be given to the reservation and the grant?

It is obvious that the general statute, first enacted in 1842, and all provisions in railroad charters relating to connections of different roads, *assume* that the tracks to be connected are of *the same gauge*. We have assumed it, thus far, in discussing the questions involved in the case before us.

But is a company, with whose road another is connected, not by any contract, but by authority of the Legislature, thereby forever *bound to retain* the same gauge? It is gen-

erally the right of every company, under its charter, to fix the gauge of its own road, and to change it at pleasure. Is this right annulled or abridged by reserving the right of connection for another company?

It may be said that the Legislature never intended to annul or restrict this right in any such case, and that a reasonable construction of such provisions of charters, and of the statute, does not lead to such a conclusion. Such statutes and charters assume that the roads so connected are of the same gauge; and while they *remain* so, the right of connection is absolute, and perfect. Nor would the company subject to such a connection be allowed *wantonly* to change the gauge of its road, *for the purpose* of interrupting the connection. But was its right to fix or change the gauge of its own road intended to be taken away? Acting, not wantonly, but in good faith, for the reason that another gauge is better, or for the purpose of making another connection, more profitable for the company, or for the better accommodation of the public, may not such company change the gauge of its road, although the previous connection is thereby practically interrupted? Is not the right of connection granted to a railroad company intended to be subject to such a contingency?

Whether the defendants have been free from fault in all matters, we need not determine. In changing the gauge of their railroad, there is no evidence that they acted wantonly *towards the plaintiffs*, or with any improper purpose. Under authority given by the Legislature in 1860, they *extended* their road, so as to form a connection with the road of another company, of a different gauge. The change in the gauge of their road was not made for the purpose of breaking the previous connection, but for the purpose of making one with another railroad, which could not be done without it. Had they the right to do this under the general powers conferred by their charter?

Upon this question, my own mind is not free from doubt, though I am inclined to the opinion that a right to connect

two railroads, reserved in the charter of the first company, and granted in the second, is, in its nature, absolute and perpetual; that the right of either to change the gauge is subject to this, and not this to that; and that the former is paramount, and must control the latter. But my associates are of a different opinion; and I do not feel very confident. My dissent is not so much from their conclusion upon this point, as upon the nature of the right conferred by charters, in which the right "to connect" is granted.